## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **RAY COLEMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Cause No. 05-CV-84-WDS** |
| | ) | |
| **SAM FLOOD and JOEL BRUNSVOLD,** | ) | |
| **individually and as Director of the Illinois** | ) | |
| **Department of Natural Resources,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM & ORDER

**STIEHL, District Judge:**

**STIEHL, District Judge:**

Before the Court is defendants' motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, to which plaintiff has filed a response and the defendants a reply. Plaintiff additionally filed supplemental exhibits to which defendants have filed a response.

## BACKGROUND

Plaintiff's action against defendants Sam Flood, the Director of Governmental Relations for the Governor's Office, and Joel Brunsvold, individually and as the Director of the Illinois Department of Natural Resources ("IDNR"), arose out of his former employment with IDNR.

The amended complaint alleges that plaintiff, an African-American male, is an active member of the Democratic Party in St. Clair County and the State of Illinois. In 1994, plaintiff did not support Democrat Sam Flood for St. Clair County Clerk, instead supporting the opposing candidate, and he has also supported Republicans for the St. Clair County Board.  On January 13, 2003, Democrat Rod Blagojevich was sworn in as the Governor of Illinois and

appointed Democrat Sam Flood as his downstate coordinator.

The amended complaint further alleges that at the time of Governor Blagojevich's election, plaintiff had been employed by IDNR as Site Superintendent of Horseshoe Lake State Park for approximately nine years. On April 7, 2003, plaintiff was informed that IDNR had decided to create the new position of "Complex Manager," and that the Complex Manager would be responsible for overseeing both Horseshoe Lake State Park and Frank Holten State Park. Over plaintiff's objections, he was promoted to the position of Complex Manager and was to receive a salary increase of $3000 per year. He began serving as Complex Manager on May 1, 2003.

The amended complaint further alleges that despite his lack of experience, Sam Flood's son, Scott, a Caucasian male, was hired for plaintiff's former position of Site Superintendent. On June 24, 2003, plaintiff sent an e-mail to supervisor Tim Hickman, complaining of Scott's shortcomings as Site Superintendent. Plaintiff asserts that this e-mail was shown to Sam Flood, following which, without an explanation or hearing, plaintiff was demoted to his former position of Site Superintendent of Horseshoe Lake State Park on June 26, 2003. Plaintiff did not receive his $3,000 per year pay increase after his promotion and prior to his demotion. On that same day, Scott Flood was transferred to Washington County Conservation Area and promoted to Regional Land Manager.

Thereafter, plaintiff was disciplined on two separate occasions, and on January 14, 2005, plaintiff's employment with IDNR was terminated.

Counts I and II of the amended complaint, against Flood and Brunsvold, individually and as Director of the IDNR, allege a violation of plaintiff's First Amendment right to be free from

discrimination in state employment on the basis of political affiliation, and assert that plaintiff

had a property interest in his positions as Site Superintendent and Complex Manager and  was

deprived of procedural due process; Counts III and IV, against Flood and Brunsvold,

individually and as Director of the IDNR, allege race discrimination in violation of the First and

Fourteenth Amendments, and assert that plaintiff had a property interest in his positions as Site

Superintendent and Complex Manager and was deprived of procedural due process; Counts V

and VI, against Flood and Brunsvold, individually and as Director of the IDNR, allege that

defendants retaliated against plaintiff for the exercise of his right to free speech under the First

Amendment.[1]

Defendants move for judgment on the pleadings.

## Analysis

A motion for judgment on the pleadings pursuant to Rule 12(c) "should be granted only if

it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for

relief. In evaluating the motion, we accept all well-pleaded allegations in the complaint as true,

drawing all reasonable inferences in favor of the plaintiff." *Thomas v. Guardsmark, Inc*., 381

F.3d 701, 704 (7th Cir. 2004)(cites omitted).  "In a motion for judgment on the pleadings, the

court considers the pleadings alone, which consist of the complaint, the answer, and any written

instruments attached as exhibits." *Hous. Auth. Risk Retention Group, Inc. v. Chicago Hous.

Auth.*,  378 F.3d 596, 600 (7th Cir. 2004)(cites omitted).

## I.    Political Patronage

Plaintiff's first claim, of political patronage, alleges that defendants violated his right to

_____

[1]The complaint appears to allege more than one cause of action in each count.  Accordingly, the Court will
address the motion for judgment on the pleadings by cause of action rather than by count.

be free from discrimination based on political affiliation, specifically, that defendants violated

his First Amendment rights when he was demoted from Complex Manager to Site

Superintendent, and then again when his employment was terminated, all because of his political

affiliation and political differences within the St. Clair County Democratic Party. Defendants

initially assert that the legality of the defendants' actions turns on the nature of the duties of both

the Complex Manager and the Site Superintendent.[2]

Government officials may not ordinarily base employment decisions on political

affiliation.  See, *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 110 S.Ct. 2729 (1990).

However, certain positions may be *Rutan*-exempt.

> The question of whether a position is exempted from the First Amendment
> patronage dismissal ban is a factual one that should ordinarily be left for a
> jury to determine....However, in some cases, the duties and responsibilities
> of a particular position are clearly outlined by law. In these cases, the
> court may make the determination, as a matter of law, that a certain
> position involves policymaking.

*Pleva v. Norquist*, 195 F.3d 905, 912 (7th Cir. 1999)(internal cites omitted).

Because defendants attached the Site Superintendent and Complex Manager position

descriptions to their answer, the Court may consider those documents without converting the

instant motion into one for summary judgment.

The position description for Complex Manager states in relevant part:[3]

---

[2]To succeed on his claim of improper dismissal or demotion based on constitutionally protected behavior,
plaintiff must prove that his political affiliation was a motivating factor in the defendants' decisions. *Selch v. Letts*, 5
F.3d 1040, 1042 (7th Cir. 1993) (cite omitted).  For purposes of ruling on the motion for judgment on the pleadings,
the Court assumes, without deciding, that defendants' actions in demoting and dismissing plaintiff were politically
motivated.

[3]The position descriptions are supplied by the Illinois Department of Central Management Services ("CMS
Position Descriptions").

Under general direction of the Regional Land Manager, organizes, plans, executes, controls and evaluates the operation of the Madison and St. Clair Counties Complex which consists of Horseshoe Lake and Frank Holten State Parks….

1.      Supervises staff...determines staffing needs to achieve program objectives…. [20%]

2.      Organizes, plans, executes, controls and evaluates the preparation and maintenance of the Complex's operational and financial records and reports; prepares and monitors operating and capital improvement budgets and annual plans of work, exercises budgetary control to ensure fiscal integrity…. [20%]

3.      Organizes, plans, executes, controls and evaluates the maintenance of site grounds, facilities, and equipment, inspect facilities for preventive maintenance planning; monitors and implements site security and safety programs to ensure compliance with applicable laws, rules and regulations. [20%]

4.      Plans, coordinates and implements activities and programs compatible with the natural resource based reviews, analyzes, and incorporates proposals of natural resource specialists and others concerning short and long range plans for site management….

5.      Establishes and maintains effective working relationships with the media and interested groups or individuals; develops/implements public information materials and programs; promotes Department programs, activities and philosophies; serves as a Department representative at various meetings…. [10%]

6.      Explains agency policies, rules and regulations to site visitors and confirms compliance with same; responds to oral and written inquiries concerning Department programs and policies; appears at public hearings as required. [5%]

7.      Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above. [5%]

See, (Doc. 23, Ex. A).

The position description for Site Superintendent states in relevant part:

Under direction, administers and manages Horseshoe Lake State Park for

5

the provision of seasonally fluctuating diverse, quality public usage programs in conjunction with resource management.

1. Plans, administers, executes, and supervises the provision of moderately intensive public usage programs….Supervises staff engaged in all operation and maintenance work activities, insuring compliance with applicable rules, regulations, policies and bargaining unit contracts…. [35%]

2. ….develops, executes and supervises the implementation of management and interpretation plans; coordinates plans of work with inter- and intra-agency specialists in the natural resource field. [20%]

3. Develops capital and operating site budgets; prepares and maintains all fiscal and budgetary information and records at the site level, insuring fiscal integrity, through timely submittal. [15%]

4. Plans, executes and supervises the implementation of a site maintenance and development program to insure the public health and safety of the site user and staff; insuring compliance with applicable mandated rules and regulations and agency policies. [10%]

5. Supervises the security and maintenance of all physical facilities and equipment and the maintenance of all appropriate records and reports. [10%]

6. Provides information to the public through the media, presentations, public hearings, and correspondence. [5%]

7. Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above. [5%]

See, (*id.*, Ex. B).

With respect to plaintiff's political patronage claim, defendants assert that political affiliation is an appropriate requirement for the two positions at issue, and therefore, they were permitted to make employment decisions concerning those positions based on political affiliation.  See, e.g., *Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 1295 (1980) (party

officials may make decisions based on political affiliation where "party affiliation is an appropriate requirement for the effective performance of the public office involved."); *Elrod v. Burns*, 427 U.S. 347, 367, 96 S.Ct. 2673, 2687 (1976) (patronage dismissals allowed with respect to policymaking positions).

In the Seventh Circuit, "[t]he test is whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719 (1982), cited in *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 355 (7th Cir. 2005). To make that determination, the Court "must examine the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office. Therefore, even if an officeholder performs fewer or less important functions than usually attend his position, he may still be exempt from the prohibition against political terminations if his position inherently encompasses tasks that render his political affiliation an appropriate prerequisite for effective performance."[4] *Id.* (internal quotes omitted).

"'[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office

---

[4]Accordingly, insofar as plaintiff has submitted an affidavit delineating the specific tasks he personally performed while in the positions of Site Superintendent and Complex Manager, that affidavit is irrelevant to this Court's analysis.

involved.'"[5] *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 756 (7th Cir. 2004)

(citing *Branti*, 445 U.S. at 517-18; *Rutan*, 497 U.S. at 71 n.5).

> Nevertheless, we begin our analysis looking for policymaking powers or confidential relationships because those terms accurately describe the vast majority of offices that fall within the realm of legitimate patronage....We keep in mind the fact that the defendant bears the burden of establishing the position is a confidential or policymaking position which would justify politically motivated employment actions.
>
> In determining whether an employee is in a policymaking position we consider, among other things, whether the employee acts as an adviser or formulates plans for the implementation of broad goals.... Job title and supervisory authority do not necessarily transform an employee into a policymaker because the employee may have only limited and well-defined objectives....On the other hand, a lower level employee may have more actual responsibility by virtue of poorly defined duties of a broad scope.

*Id.* (internal citations omitted).

Defendants argue that in light of the duties and responsibilities inherent in both the Site Superintendent and Complex Manager positions, making employment decisions based on political affiliation with respect to those positions is permissible.

The Seventh Circuit has considered political patronage claims on several occasions. For example, in *Bicanic v. McDermott*, 867 F.2d 391 (7th Cir. 1989), the court upheld a district court finding that plaintiff's politically-motivated termination by the City of Hammond, Indiana from his position as the Administrator of Parks and Recreation was permissible. Plaintiff, as Administrator, prepared budgets, organized and coordinated the park and recreation program for

---

[5]As the Seventh Circuit noted, "[t]he term 'policymaker' is somewhat misleading because not all public employees who make policy can be dismissed for political reasons, just as there is no absolute prohibition against the political dismissal of any public employee who is not a 'policymaker'." *Thompson*, 300 F.3d at 756 (cites omitted). Political affiliation may also be considered with respect to employees who have discretion in implementing policies. See, *Wilbur v. Mahan*, 3 F.3d 214, 217 (7th Cir. 1993).

the City and its school system, recommended new hires, and negotiated and signed contracts on behalf of the City.  *Id.* at 393.  The court concluded that the "political officials must be able to count on the support of those who prepare budgets, negotiate and sign contracts, and generally run the show at a substantial component of government."  *Id.* at 394.  The court rejected the plaintiff's argument that by the time he was fired, he had been stripped of his principal duties, stating that it is "the powers of the office, not the tasks of its occupant [that] determine whether the occupant may be dismissed on political grounds." *Id.*

In *Selch*, the court found that the plaintiff in his former position as Highway Subdistrict Superintendent was not protected from a patronage dismissal.  The court reasoned that "although upper levels of management provided the subdistrict superintendent with guidelines for the execution of maintenance work, the effective implementation of road maintenance policy...entailed more than ensuring that maintenance procedures were completed. The subdistrict superintendent could decide where and when the work was to be completed. The way in which subdistrict superintendents...exercised this discretion could impact greatly the effectiveness of Department services."  *Selch*, 5 F.3d at 1046.

### A.    Site Superintendent

Here, in order to determine whether the positions at issue are *Rutan*-exempt, it is necessary to distinguish between the two positions at issue.  The defendants rely upon an unreported case from the Northern District of Illinois, *Park Superintendents' Prof'l Ass'n v. State of Ill.*, 1998 WL 525810 (N.D.Ill. Aug. 18, 1998) (unreported),  to support their claim that the Site Superintendent position is *Rutan*-exempt. In *Park Superintendents*, the court concluded that the Site Superintendent position for an Illinois state park was a policymaking position that

9

has no protection from a patronage dismissal, and is therefore, *Rutan*-exempt. *Id.* at *6. In making that determination, the court relied upon the position description and an Illinois State Labor Relations's Board's ("ISLRB") decision that Site Superintendents are managers and therefore exempt from collective bargaining agreements. The court stated: "By themselves the grievances and memorandums do not definitively show the Site Superintendents are *Rutan* exempt, but they support the ISLRB's findings that the Site Superintendents deal with budgetary issues, supervise employees and organize and implement various programs....," and that the Site Superintendents "are responsible [for] effectuating management policies and functions because they determine how to allocate site resources and personnel to best fulfill their agencies' prerogative." *Id.* While *Park Superintendents* is instructive, it has no precedential value in this Court. Moreover, there is no evidence that the job duties in the Site Superintendent position at issue are identical to the duties inherent in the position at issue eight years ago in *Park Superintendents*.

In response to defendants' motion, plaintiff cites the recently decided case *Kiddy-Brown* to support his position. In *Kiddy-Brown*, the Seventh Circuit concluded that judgment on the pleadings was not appropriate where plaintiff alleged in her complaint that the warden's duties and responsibilities were of limited scope, did not involve autonomous or discretionary authority, did not involve participating in determining policy which fixed objectives, and did not involve acting authoritatively on any policymaking issue impacting the State or the Illinois Department of Corrections. *Kiddy-Brown*, 408 F.3d at 355. In an affidavit attached to his response, plaintiff states that he, likewise, had no policymaking authority and no input into policy, no discretionary or autonomous authority, no authority to hire, fire or promote

10

employees, and no budgetary authority. (Doc. 41, Ex. 2).  Plaintiff, however, does not appear to challenge the validity of the job description (in fact, he relies on the position descriptions),  nor does he dispute the duties inherent in the positions at issue; rather, in his response to the motion for judgment on the pleadings, he now asserts that he did not personally perform those duties.[6] See, *Kiddy-Brown*, 408 F.3d at 351 n.3 (discussing *Thompson*, 300 F.3d at 756-57 (noting that courts must focus on duties inherent in office, and not functions of the position performed by particular person, and concluding, after examining job description which plaintiff attached to complaint and noting that plaintiff presented no conflicting allegations to contradict the job description, that plaintiff held a policymaking position)).

Despite plaintiff's misplaced emphasis on the duties that he himself performed as  Site Superintendent, the Court finds that the defendants have failed to prove that the position of Site Superintendent is *Rutan*-exempt.  There is little in the position description to suggest that plaintiff acted as an advisor or formulated plans for the implementation of broad goals.  Rather, there are numerous indications in the position description that, when taken together, lead the Court to conclude that  plaintiff's position involved only limited and well-defined objectives.

---

[6]The amended complaint contains no allegations with respect to the job duties of a Site Superintendent or a Complex Manager.

Plaintiff's affidavit states, *inter alia*, that he: did not participate in determining policy with fixed objectives or goals or developing policy to control actions toward operating objectives; was advised that he had no authority to set policy for the parks; was responsible for following extensive rules; had no autonomous or discretionary authority; had no authority to hire, fire and discipline employees; had no budgetary authority and no input into the formulation of a budget; and did not work with high level authorities in the government. See, (Doc. 41, Ex. 2). The affidavit does not purport to describe the "duties inherent" in the positions or to contest the accuracy of the position descriptions themselves.

Plaintiff has also submitted as a supplemental exhibit the affidavit of Rick Messinger, Regional Land Manager and plaintiff's supervisor. See, (Doc. 47, Ex. 4).  The Court first notes that, according to the affidavit, Messinger was plaintiff's supervisor through May of 2003; plaintiff did not even begin serving as Complex Manager until May 1, 2003, and was not demoted until June 26, 2003 and terminated until January 14, 2005.  Accordingly, Messinger's affidavit does not address most of the relevant time period.  Moreover, Messinger makes declarations similar to those of plaintiff, as to the duties and limitations specific to plaintiff while he was employed as Site Superintendent and Complex Manager.

For instance, the description speaks in terms of the employee acting "under direction" in the management of a single park, Horseshoe Lake; job duties include planning and administering park programs, supervising staff in operations and maintenance, maintaining personnel records, and developing operating site budgets.  (See, Doc. 23, Ex. B).  Tellingly, the position description itself states that the position is not *Rutan*-exempt. See, (*id*., Ex. B).

Accordingly, drawing all reasonable inferences in favor of the plaintiff, the Court finds that defendants have failed to sustain their burden of proof with respect to their assertion that the Site Superintendent position is *Rutan*-exempt.[7]  It is certainly possible that defendants may be able to produce additional evidence at the summary judgment stage that demonstrates that the Site Superintendent position is a policymaking position.  However, at the pleading stage of these proceedings, the Court finds that defendants have failed to sustain their burden.

**B.**      **Complex Manager**

The opposite is true with respect to the position of Complex Manager.  The position description states that the Complex Manager, "[u]nder general direction of the Regional Land

---

[7]Defendants also argue that the Site Superintendent position is *Rutan*-exempt because plaintiff, in that position, acted as a spokesperson.  The Court disagrees.  The position description indicates that approximately five percent of the Site Superintendent's job duties include providing "information to the public through the media, presentations, public hearings, and correspondence." (Doc. 23, Ex. B).  Initially, the Court notes that the description itself is vague.  Moreover, defendants have provided no case law that would lead the Court to conclude that the position of Site Superintendent is analagous to the typical "spokesperson" positions in which political affiliation plays a role.  See, e.g, *Branti*, 445 U.S. at 518 ("Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments."); *Snyder v. Blagojevich*, 332 F.Supp.2d 1132, 1138 (N.D. Ill.2004) ("Position Description specifies that an Assistant Warden 'speaks to lay and professional groups regarding various institutional programs' and 'answers correspondence from the general public,' State Officials had a legitimate interest in ensuring that any person who held the Assistant Warden position would accurately represent their policy viewpoints in his interactions with the public.").  There is simply no indication that a Site Superintendent position "involve[s] communication with the public or the media on issues of potential political concern." *Nathan v. City of Chicago*, 1992 WL 80503, at *2 (N.D. Ill. Apr. 7, 1992).

Manager, organizes, plans, executes, controls and evaluates the operation of the Madison and St. Clair Counties Complex which consists of Horseshoe Lake and Frank Holten State Parks; supervises through subordinate supervisors, a large subordinate staff organization engaged in site maintenance, operational and interpretive activities…." (Doc. 23, Ex. A),  which suggests a much higher level of responsibility and autonomy than that found in the Site Superintendent's position, who "[u]nder direction, administers and manages Horseshoe Lake State Park...." (Doc. 23, Ex. B); see also, *Selch*, 5 F.3d at 1043 ("As an employee's level of responsibility increases, so does his ability to obstruct the implementation of policy.").   The Complex Manager, *inter alia*, "prepares and monitors operating and capital improvement budgets and annual plans of work, exercises budgetary controls to ensure fiscal integrity;... incorporates proposals of natural resource specialists and others concerning short and long range plans for site management;... responds to oral and written inquiries concerning Department programs and policies; appears at public hearings as required."  In addition, the position description itself states that the position is *Rutan*-exempt.  Based on the totality of the position description, the Court finds that the Complex Manager has a significant amount of responsibility and the opportunity both to provide meaningful input into the formulation of long and short-term objectives and to affect the implementation of policy, and therefore, that the position of Complex Manager is *Rutan*-exempt.

Accordingly, the Court grants defendants' motion for judgment on the pleadings with respect to plaintiff's political patronage claim insofar as that claim involves defendants' action in demoting plaintiff from the position of Complex Manager to Site Superintendent.

### C.    Qualified Immunity

Defendants claim that, even if plaintiff has alleged a constitutional violation, defendants

are entitled to qualified immunity with respect to plaintiff's political patronage claim for

damages because plaintiff has not alleged a violation of a "clearly established" right.  A

government official is entitled to qualified immunity only when their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable public official would

have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982).   Here,

defendants claim that they are entitled to qualified immunity with respect to the political

patronage claim because plaintiff has not sustained his burden of proof, specifically, that plaintiff

has not pointed to a case that specifically rejects a *Branti* argument for either of the positions that

plaintiff occupied during his employment with IDNR.[8]  The Court is not persuaded by

defendants' argument.  As plaintiff states, he is not required to cite a case that is factually

identical to the one at bar. The Supreme Court noted:

> [O]ur cases establish that the right the official is alleged to have violated
> must have been "clearly established" in a more particularized, and hence
> more relevant, sense: The contours of the right must be sufficiently clear
> that a reasonable official would understand that what he is doing violates
> that right. This is not to say that an official action is protected by qualified
> immunity unless the very action in question has previously been held
> unlawful, but it is to say that in the light of pre-existing law the
> unlawfulness must be apparent.

*Anderson v. Creighton*,  483 U.S. 635, 640, 107 S.Ct. 3034, 3039 (1987) (internal cite omitted).

"'The question is whether a reasonable state actor would have known that his actions, viewed in

the light of the law at the time, were unlawful.'"  *Kiddy-Brown*, 408 F.3d at 356 (citing *Nabozny

v. Podlesny*, 92 F.3d 446, 456 (7th Cir.1996)).

    Here, the Court finds that the rights allegedly violated by defendants were clearly

---

[8]The Court notes that, based on its analysis thus far, the Site Superintendent is the only position that
remains at issue with respect to plaintiff's political patronage claim.

established prior to plaintiff's termination from the position of Site Superintendent,[9] and

defendants, at least based on the record now before the Court, are not entitled to qualified

immunity on plaintiff's political patronage claim as it relates to plaintiff's termination from that

position.

**II.**     <u>**First Amendment Right to Free Speech**</u>

Plaintiff also alleges that defendants  violated his First Amendment rights in that he was

demoted and/or terminated in retaliation for the exercise of his free speech.  "In order to

establish a First Amendment retaliation claim, a plaintiff must show (1) that [he] engaged in

constitutionally-protected speech and (2) that [his] speech was a substantial or motivating factor

in the defendants' challenged actions." *Kiddy-Brown*, 408 F.3d at 357.

Insofar as plaintiff's claim relates to his demotion, "the First Amendment does not

prohibit the discharge of a policy-making employee when that individual has engaged in speech

on a matter of public concern in a manner that is critical of superiors or their stated policies."

*Vargas-Harrison v. Racine Unified Sch. Dist*., 272 F.3d at 964, 971 (7th Cir. 2002) (citing

*Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir.1995); *Wilbur v. Mahan*, 3 F.3d 214, 219 (7th

Cir.1993)).  Here, plaintiff's speech, as alleged in the amended complaint, falls squarely into the

above-cited rule.  Specifically, plaintiff alleges that he was demoted and/or dismissed in

retaliation for "his complaints about political nepotism within the Department, his criticism of

the ban on alcohol consumption at Frank Holten State Park, and other statements he made

regarding issues of public policy."  See, (Doc. 22, Amended Compl., Cts. V and VI at ¶ 27.)

Accordingly, in light of the Court's findings that the Complex Manager position qualifies

---

[9]Moreover, the Court points out that again the Site Superintendent position description itself states that the position is not *Rutan*-exempt.

as a policymaking position, the Court finds that judgment on the pleadings is appropriate with respect to plaintiff's First Amendment retaliation claim insofar as it relates to speech that resulted in plaintiff's allegedly retaliatory demotion from Complex Manager to Site Superintendent.

With respect to his termination from the position of Site Superintendent, however, the Court must consider plaintiff's claim under the established standard set forth in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731 (1968).  "Thus, courts faced with a public employee's First Amendment retaliation claim must balance 'the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Kiddy-Brown*, 408 F.3d at 358 (citing *Pickering*, 391 U.S. at 568).

Here, in light of plaintiff's allegations and defendants failure to establish that the Site Superintendent position is a policymaking position, it is inappropriate at this early stage to enter judgment on the pleadings with respect to plaintiff's retaliation claim as it relates to his termination from the position of Site Superintendent.

## III.    Procedural Due Process

Plaintiff also alleges that his procedural due process rights were violated in that he had a protectible property interest in his employment and he never received notice and a hearing prior to his demotion from Complex Manager to Site Superintendent nor prior to his termination from the position of Site Superintendent.

> The Fourteenth Amendment prohibits state governments from depriving an individual of a property interest without due process of law. An individual may have a property interest in continued employment. However, not every employment situation creates an expectation of

16

> continued employment that rises to the level of a property interest
> protected by the Due Process Clause. We have recognized that in the
> employment context a property interest can be created either by an
> independent source such as a state law securing certain benefits or by a
> clearly implied promise of continued employment.

*Pleva*, 195 F.3d at 913-14 (internal cites omitted).  "In order to demonstrate that she has been

subject to a due process violation, a plaintiff must show (1) that she had a constitutionally

protected property interest, (2) that she suffered a loss of that interest amounting to a deprivation

and (3) that the deprivation occurred without due process of law." *Kiddy-Brown*, 408 F.3d at 360

(cite omitted).

Here, the amended complaint alleges that plaintiff had a property interest in the positions

of Complex Manager and Site Superintendent.  Plaintiff claims that his property interest in his

position as Complex Manager was created by an oral offer of continued employment if plaintiff

agreed to transfer to the position of Complex Manager. Plaintiff also claims that a property

interest in both positions was created under Illinois state law.

Again, it is necessary to consider the demotion and termination separately.  With respect

to plaintiff's demotion from the position of Complex Manager, as the Seventh Circuit has

concluded when presented with similar circumstances, if plaintiff "can be terminated, demoted,

or transferred at will for political reasons, he has no property interest in the position...."

*Thompson*, 300 F.3d at 758.  Given the Court's conclusion that the Complex Manager position

was a policymaking one, and therefore, plaintiff could be terminated from the position at will for

political reasons, he had no protectible property interest in that position. Absent a property

interest in the position of Complex Manager, plaintiff cannot show that his due process rights

were violated at the time of his demotion.  Accordingly, defendants' motion for judgment on the

pleadings is granted with respect to plaintiff's claim that he had a property interest in the Complex Manager position and that he was demoted without notice or a hearing.

The non-policymaking position at issue, however, that of Site Superintendent, is a different story. The Illinois Personnel Code cited by plaintiff "generally provide employees subject to its procedures a hearing prior to termination for cause." *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004), cited in *Kiddy-Brown*, 408 F.3d at 360; 20 ILCS 415/8b.16 (providing "[f]or hearing before discharge or demotion with the prior approval of the Director of Central Management Services only for cause after appointment is completed, after the person to be discharged or demoted has been presented in writing with the reasons requesting such discharge or demotion").

Here, based on the foregoing and the allegations found in the amended complaint, the Court finds that plaintiff has alleged a clearly established violation of his constitutional rights, and therefore, it is not appropriate at this time to enter judgment on the pleadings with respect to plaintiff's due process claim that he was terminated from the position of Site Superintendent without notice or hearing.

## IV.   Race Discrimination

Finally, plaintiff alleges an equal protection claim under 42 U.S.C. § 1983. "To state a valid cause of action under 42 U.S.C. § 1983, a plaintiff must allege first that the defendant has deprived the plaintiff of a right secured by the Constitution and laws of the United States, and second, that the defendant acted under color of state law in making that deprivation. *Starnes v. Capital Cities Media, Inc.*, 39 F.3d 1394, 1396 (7th Cir. 1994) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604 (1970)).

18

The amended complaint alleges that defendants violated plaintiff's equal protection rights in that employment actions were taken against him on account of his race.  In his response to the motion for judgment on the pleadings, plaintiff asserts that he has stated a claim under the Equal Protection Clause and under Title VII (the latter allows him to bring a claim against Brunsvold in his official capacity, see, e.g., *Nanda v. Bd. of Trustees of Univ. of Illinois*, 303 F.3d 817, 831 (7th Cir. 2002)).

Defendants essentially argue that plaintiff's claim must fail because plaintiff does not allege facts of racial discrimination sufficient to support a claim against them and instead relies upon conclusory allegations.  However, a motion for judgment on the pleadings can be granted only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief.  Here, it does not so appear.  See, e.g., *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) ("Because racial discrimination in employment is 'a claim upon which relief can be granted', this complaint could not be dismissed under Rule 12(b)(6). 'I was turned down for a job because of my race' is all a complaint has to say." ).

Plaintiff's amended complaint alleges that he is African-American, and that he was removed from his position as Site Superintendent against his will and replaced with a white male. It further alleges that he was demoted and then terminated based on his race, and that defendants acted intentionally to discriminate against him based on his race.  At this early stage of pleading, it is premature to enter judgment on the pleadings with respect to plaintiff's claims of race discrimination under the Equal Protection Clause and Title VII.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** in part and **DENIES** in part defendants'

motion for judgment on the pleadings.  The Court **GRANTS** defendants' motion for judgment on the pleadings with respect to plaintiff's political patronage, retaliation, and due process claims as those claims relate to plaintiff's demotion from the position of Complex Manager. The Court **DENIES** defendants' motion for judgment on the pleadings with respect to plaintiff's political patronage, retaliation, and due process claims as they relate to plaintiff's termination from the position of Site Superintendent; the Court also **DENIES** defendants' motion for judgment on the pleadings on  plaintiff's race discrimination claim.  For purposes of case management and maintaining a clean record, plaintiff is **DIRECTED** to file, within ten days of the date of this Order, a second amended complaint consistent with the Court's rulings herein.

      **IT IS SO ORDERED.**

      **DATED: July 29, 2005**

                            **s/ WILLIAM D. STIEHL**
                              **DISTRICT JUDGE**